IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 9, 2004

## JOHN EARL SCALES v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 96-A-339      Steve R. Dozier, Judge**

---

**No. M2003-01753-CCA-R3-PC - Filed July 13, 2004**

---

The petitioner appeals the denial of post-conviction relief relating to his convictions for felony murder and attempted aggravated robbery. On appeal, the petitioner contends he received ineffective assistance of counsel at trial and on appeal. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the appellant, John Earl Scales.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Ryan D. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The petitioner was convicted of the felony murder of Chester Martin and the attempted aggravated robbery of Alvin Bevels for offenses occurring on December 13, 1995. The petitioner received concurrent sentences of life imprisonment and three years, respectively. This court affirmed the petitioner's convictions and sentences on direct appeal. *See* State v. John Earl Scales, No. 01C01-9709-CR-00412, 1999 Tenn. Crim. App. LEXIS 168, at *2 (Tenn. Crim. App. Feb. 24, 1999), *perm. to app. denied* (Tenn. 1999).

We relate the following facts as appearing in this court's opinion on direct appeal:

In the early evening of Wednesday, December 13, 1995, around 6:00 or 6:30 p.m., two men approached Vera Thompson and Alvin Bevels, who were sitting on the patio of Thompson's apartment. At least one of the men carried a gun. They asked Thompson and Bevels for their money and began going through Bevels'

pockets. When Thompson spoke to one of the men as if she recognized him as a former neighbor in the apartment complex, the men walked away. They then confronted Chester Martin and his friend. They told Martin to "set it out," which apparently means to give them their money, and began to go through his pockets. When Martin asked them if they were "tripping," one of the robbers said, "You think you're smart." Martin was then shot, and as he attempted to run away, he was shot again.

After talking with several witnesses, who gave "real consistent" descriptions of the shooter, the police believed the shooter to be the [petitioner], who had previously lived in the apartment complex with his sister, Nicole Scales. In an effort to prepare a photographic line-up, the police went to Nicole's new residence. The police told Nicole about the murder, including the approximate time it occurred, and advised her that they were attempting to eliminate her brothers as suspects. At the time, the [petitioner] was in the room, and although the police did not ask him any questions, he volunteered that he had been at Nicole's residence the entire day and evening. Nicole and Lamont, one of the [petitioner's] brothers, agreed the [petitioner] had been home with them all night.

Two eyewitnesses who lived at the apartment complex where the shooting occurred, Vera Thompson and Angela Hornbeck, identified the [petitioner] in a photographic line-up. John Alexander, Jr., who was Martin's companion when he was shot, was also shown a photographic line-up that included the [petitioner's] picture, but he could not identify anyone. The man accompanying the [petitioner] was never identified.

The State's theory at trial was that the [petitioner] attempted to rob Bevels and shot Martin because he was "strung out" on crack cocaine and needed money to support his habit. Thompson testified she was sitting on the patio of her apartment enjoying a "cup of beer" with Bevels when two black males with a gun approached them. Thompson identified the [petitioner] as one of the men, but she did not know the other. According to Thompson, the [petitioner] was wearing a jacket with a hood that was trimmed with fur, but when he approached them, the hood was not on his head. Thompson testified she knew the [petitioner] because he had previously lived next to her in the apartment complex, but the [petitioner] did not appear to recognize Thompson, who was not wearing her glasses at the time. Thompson testified she believed the [petitioner] was playing a joke on them with a fake gun, but Bevels told her to take the men seriously because the gun was real. According to Thompson, she asked the [petitioner] why he no longer visited the neighborhood, which prompted the [petitioner] to recognize her, say to his companion, "Come on, man; let's go," pull the hood over his head, and walk away from them. Thompson testified she then witnessed the [petitioner] and his companion accost another set of individuals

entering the apartment complex. Thompson testified she saw the [petitioner] pull a gun and shoot the victim twice.

Bevels testified that two males, one dark-skinned and one light-skinned, approached him while he sat with Thompson on her patio. Bevels identified the [petitioner] as the dark-skinned male and testified that although the [petitioner] was wearing a blue hood when he approached him, the [petitioner's] face remained visible. According to Bevels, the [petitioner] held a pistol in his stomach and said, "You know what it is." Bevels testified he told the [petitioner] he did not have anything, and the [petitioner] checked his pockets. According to Bevels, when Thompson spoke to the [petitioner], the [petitioner] appeared to recognize her, and as a result, retreated. Bevels testified the [petitioner] and his companion then approached Martin and Alexander, held a pistol to Martin as if to rob him, and then shot Martin twice.

Hornbeck testified that on the night of the shooting, she was near the window in her second-story apartment when she saw a dark-skinned man wearing a black hooded jacket, carrying a gun, and scuffling with one or two other people. According to Hornbeck, she heard two gunshots shortly thereafter. She testified that because the man with the gun "turned right into the light under her window," she recognized him as a former resident who had lived in the apartment complex with his sister, Nicole. Hornbeck identified the [petitioner] as the shooter.

To defeat the testimony of these three eyewitnesses, the [petitioner] relied upon an alibi defense. Alexander, Martin's companion when he was shot, testified he had made eye contact with the shooter and that the shooter was a light-skinned black male, not a dark-skinned black male. He could not identify the [petitioner] as the shooter.

Terry Meese testified that on December 13, 1995, around 3:30 p.m., he visited the [petitioner] at his apartment and within the next hour, they went to a Pharmart convenience store, where they purchased some soda. According to Meese, they then returned to Meese's apartment, where they watched television throughout the early evening and ate a supper Meese's girlfriend prepared. Meese testified that the [petitioner] then took a short nap and left his apartment around 9:15 p.m. Meese's girlfriend and the [petitioner] substantially corroborated this testimony.

A manager at the Pharmart convenience store testified that Meese came to the store on Friday, December 15, 1995, and asked for the surveillance tapes from the afternoon of December 13. According to the managers testimony, she told Meese that she could release the surveillance tapes only to a police officer. Meese testified that when he learned the [petitioner] had been arrested for murder, he contacted Detective Roland of the Metropolitan-Nashville Police Department and told him that

surveillance tapes at the Pharmart convenience store would prove that he and the [petitioner] had been there December 13. Officer James Scales of the Metropolitan-Nashville Police Department, one of the [petitioner's] brothers, also testified that he called Detective Roland as soon as he learned of the [petitioner's] arrest. According to Officer Scales, he called Detective Roland in order to get more information on the arrest, to tell him about the surveillance tapes, and to give him names of alibi witnesses, but Detective Roland became agitated by this information and by Officer Scales' questions. According to Officer Scales, when he asked Detective Roland if he was planning to retrieve the surveillance tapes, Detective Roland hung up on him.

Detective Roland testified that Officer Scales called him on Friday, December 15, to give him names of alibi witnesses, but he first learned of the possible existence of surveillance tapes on December 18, when Meese called him. According to Detective Roland, he then called the Pharmart store and spoke with a clerk, who told him that she did not have access to the surveillance tapes and that he needed to talk with a manager. Detective Roland testified he left a message for the manager, and when he finally spoke with her on December 21, she informed him that the tapes were no longer available and that even if they had been available, they would not have reflected the date or whether the time was a.m. or p.m. According to the Pharmart manager, approximately one week passed between the time she spoke with Meese and a police officer contacted her about getting a copy of the surveillance tapes, but by then, the tapes were unavailable because they had been taped over, erased, or otherwise destroyed.

Several people acquainted with the [petitioner] testified that the [petitioner] did not appear as if he took drugs. The [petitioner] himself testified he was not a drug addict and had not been using crack cocaine within six months of the murder, although he did admit to using marijuana at least twice a week during that time. He denied killing Martin and testified he was with Meese when the shooting occurred. The [petitioner] also testified that on the night of the murder, when Detective Roland and other police officers visited his sister Nicole's residence, he said he had been at her residence that evening, but he did not indicate how long he had been there. He testified that when he talked with the police that evening, it had "slipped [his] mind" he had been with Meese at the time the shooting occurred because, according to the [petitioner], he was distracted by his curiosity why the police were interested in where his brother Lamont had been that evening.

*Id.* at **2-9.

## I.  POST-CONVICTION RELIEF HEARING

At the post-conviction relief hearing, trial counsel stated he was relieved as counsel prior to the hearing of the motion for new trial, and, during that hearing, he testified regarding his

effectiveness at trial. Trial counsel testified that in investigating the petitioner's case, he hired a criminal investigator who aided in locating and obtaining statements from witnesses and in investigating the crime scene. Trial counsel stated the petitioner's brother, who was a police officer, also aided in the investigation. Trial counsel recalled that prior to trial, the state presented the petitioner with a plea offer of manslaughter with either a two or four-year sentence. After trial counsel informed the petitioner of the advantages of accepting the offer, the petitioner rejected the offer and continued to maintain his innocence.

Trial counsel recalled two eyewitnesses to the offenses, Vera Thompson and Angela Hornbeck. The offenses occurred below Hornbeck's second floor apartment which overlooked the street. Trial counsel testified that in cross-examining Hornbeck at trial, he focused upon her identification of the petitioner in a photographic lineup during which Hornbeck stated she was only 50% positive that the petitioner was the perpetrator. Trial counsel further stated he questioned Thompson at trial regarding her drug use and her vision, and he obtained her criminal record.

The trial court appointed different counsel to represent the petitioner at the motion for new trial and on appeal. Appellate counsel testified he reviewed the trial record and chose those issues to appeal which he believed had merit. Based upon the petitioner's suggestion, appellate counsel raised ineffective assistance of trial counsel as an issue in an amended motion for new trial. Appellate counsel stated both he and the petitioner identified specific issues regarding ineffective assistance of trial counsel.

Appellate counsel testified that when he filed the motion for new trial, he was unaware that by raising ineffective assistance of trial counsel, the petitioner would be precluded from raising the issue as a ground for post-conviction relief. Following the trial court's denial of the motion for new trial, appellate counsel advised the petitioner that if he raised ineffective assistance of trial counsel as an issue on direct appeal, he could be barred from raising the claim during a later proceeding. Appellate counsel recalled he filed a motion with the appellate court requesting he be permitted to withdraw the issue and preserve it for a later proceeding. The appellate court agreed to allow appellate counsel to withdraw the issue but declined to determine whether the petitioner would be permitted to raise the claim at a later proceeding. Appellate counsel stated that based upon this ruling, he chose to proceed with the issue on direct appeal.

Appellate counsel testified he argued trial counsel was ineffective in failing to impeach Thompson with her prior convictions. Appellate counsel explained he did not present judgments of Thompson's prior convictions during the hearing on the motion for new trial because he believed trial counsel's testimony during the hearing that Thompson had convictions, which he could have used to impeach her testimony, was sufficient to establish ineffectiveness. Appellate counsel stated he did not argue that trial counsel was ineffective in failing to object to hearsay statements at trial.

The petitioner testified he did not instruct appellate counsel to raise ineffective assistance of trial counsel as an issue in the motion for new trial, and appellate counsel did not discuss with him the decision to pursue the issue on direct appeal. The petitioner stated appellate counsel did not

provide him with the appellate brief until it had been filed. The petitioner contended that when appellate counsel raised issues of ineffective assistance of trial counsel, he failed to raise the claim in its entirety.

The petitioner testified that despite his instructions, appellate counsel failed to raise issues regarding his "factual contentions of innocence and [his] theory of the case." The petitioner stated he informed appellate counsel of the person whom he believed committed the offenses and instructed appellate counsel to develop witnesses in order to establish his contentions. These witnesses included the petitioner, the petitioner's sister, and Michael Thompson, Vera Thompson's deceased brother. The petitioner testified appellate counsel failed to argue that due to conflicts in the evidence, the proof was insufficient to establish that a robbery occurred.

## II. POST-CONVICTION COURT'S FINDINGS

In denying relief, the post-conviction court found any issues regarding trial counsel's performance had been previously determined in the direct appeal or were waived. The court further found that, notwithstanding waiver, the petitioner received effective assistance of trial counsel.

Regarding appellate counsel's failure to argue that trial counsel was ineffective due to his inadequate investigation of the case resulting in an ineffective cross-examination of Thompson, the post-conviction court referred to this court's opinion on direct appeal which noted that trial counsel spent more than one hundred hours preparing the case. The post-conviction court found appellate counsel's failure to raise this issue on direct appeal did not result in prejudice.

Regarding appellate counsel's failure to enter Thompson's prior record at the hearing on the motion for new trial, the post-conviction court noted that although Thompson had been charged with approximately ten different offenses, half of the charges were retired. The court further noted the convictions were outside the applicable ten-year time frame for impeachment purposes pursuant to Tennessee Rule of Evidence 609(b). As a result, the court found the petitioner failed to establish prejudice.

Regarding appellate counsel's failure to argue that trial counsel was ineffective in neglecting to object to hearsay statements, the post-conviction court found the petitioner failed to establish that appellate counsel was deficient. The court further found the petitioner failed to establish prejudice. Regarding appellate counsel's failure to raise prosecutorial misconduct as an issue on direct appeal, the petitioner failed to establish ineffectiveness due to the absence of proof relating to this issue.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

The petitioner contends he received ineffective assistance of counsel at trial and on appeal. We disagree.

For a petitioner to successfully overturn a conviction based on ineffective assistance of counsel, the petitioner must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, the petitioner must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Should the petitioner fail to establish either factor, the petitioner is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069). The petitioner is not entitled to the benefit of hindsight; the petitioner may not second-guess a reasonably based trial strategy; and the petitioner may not criticize a sound, but unsuccessful, tactical decision made after adequate preparation for the case. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see* Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The petitioner bears the burden of proving his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). The findings of fact made by the post-conviction court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. *See* Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003).

## A.  Trial Counsel

On direct appeal, the petitioner contended trial counsel was ineffective (1) in failing to object to certain remarks made by Vera Thompson during her testimony; (2) in failing to impeach Thompson with her prior criminal record; and (3) in failing to object to testimony regarding the petitioner's past drug use. John Earl Scales, 1999 Tenn. Crim. App. LEXIS 168, at **13-20. The petitioner further submitted on direct appeal that his counsel at the preliminary hearing was ineffective in failing to obtain surveillance tapes from a convenience store. *Id.* at *20. A panel of this court denied the petitioner relief on these issues. *Id.* at **13-20.

The petitioner subsequently filed a *pro se* petition for post-conviction relief alleging numerous grounds of ineffective assistance of appellate counsel. The petitioner further alleged grounds of ineffective assistance of trial counsel. The post-conviction court summarily dismissed the petition, and the petitioner appealed. *See* John Earl Scales v. State, No. M2001-00310-CCA-R3-PC, 2002 Tenn. Crim. App. LEXIS 721, at *2 (Tenn. Crim. App. Aug. 23, 2002). On appeal, this court held the post-conviction court erred in summarily dismissing the petitioner's claims of ineffective assistance of appellate counsel. *Id.* However, this court affirmed the summary dismissal of the

petitioner's other grounds for relief, including ineffective assistance of trial counsel, as issues which had been previously determined on direct appeal. *Id.* at **2-3.

In his amended post-conviction relief petition, the petitioner asserted trial counsel was ineffective (1) in failing to investigate the facts; (2) in failing to investigate Thompson's criminal background; and (3) in failing to adequately impeach Thompson's credibility at trial. The petitioner submits the post-conviction court erred in finding the issues regarding trial counsel's performance had been previously determined or were waived. We disagree.

Although not raised by either party in the present appeal, we conclude that pursuant to the law of the case doctrine, the post-conviction court properly denied the petitioner relief regarding his allegations of ineffective assistance of trial counsel. Generally, the law of the case doctrine prohibits a court from reconsidering issues which have been decided in a prior appeal of the same case. State v. Jefferson, 31 S.W.3d 558, 560-61 (Tenn. 2000). This doctrine applies to issues which were before the appellate court in the first appeal, as well as issues which were decided by implication. *Id.* at 561. In a prior appeal of the present case, this court held the petitioner's allegations of ineffective assistance of trial counsel had been previously determined on direct appeal and, thus, could not form the basis of post-conviction relief. *See* John Earl Scales, 2002 Tenn. Crim. App. LEXIS 721, at *3. Therefore, the law of the case doctrine bars relief on this issue.

Even if the law of the case doctrine does not apply, the petitioner is not entitled to relief on this issue. Pursuant to the Post-Conviction Procedure Act, a ground for relief has been previously determined if "a court of competent jurisdiction has ruled on the merits after a full and fair hearing." Tenn. Code Ann. § 40-30-106(h) (2003). Furthermore, "[a] full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." *Id.* The record reveals that the petitioner alleged various claims of ineffective assistance of trial counsel in his amended motion for new trial and presented evidence related to these claims during the hearing.

As this court has previously noted, raising a claim of ineffective assistance of counsel on direct appeal is "fraught with peril." Thompson v. State, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997). Generally, ineffective assistance of counsel is "a single ground for relief," even though the violation may be established by multiple acts or omissions. *Id.* (citations omitted). Furthermore, a petitioner may not relitigate previously determined grounds for relief through the presentation of additional factual allegations. Cone v. State, 927 S.W.2d 579, 582 (Tenn. Crim. App. 1995), *cert. denied*, 519 U.S. 934 (1996). Thus, the petitioner's additional allegations of ineffective assistance of trial counsel in the present appeal are waived as this ground for relief has been previously determined on direct appeal.

The petitioner contends we should not consider these additional allegations of ineffective assistance of trial counsel as waived because he did not knowingly and understandingly fail to raise the allegations. In the post-conviction context, waiver applies "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent

jurisdiction in which the ground could have been presented[.] . . ." Tenn. Code Ann. 40-30-106(g). The petitioner's contention that he did not personally, knowingly, and understandingly fail to raise the additional allegations is without merit.

## B.  Appellate Counsel

By raising the issue of ineffective assistance of trial counsel on direct appeal, the petitioner is not precluded from asserting ineffective assistance of appellate counsel as a ground for post-conviction relief.  *See* Kendricks v. State, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999).  It is counsel's responsibility to determine the issues to present on appeal.  State v. Matson, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986) (citing State v. Swanson, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984)).  This responsibility addresses itself to the professional judgment and sound discretion of appellate counsel.   Porterfield v. State, 897 S.W.2d 672, 678 (Tenn. 1995).   There is no constitutional requirement that every conceivable issue be raised on appeal. Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004).  The determination of which issues to raise is a tactical or strategic choice. *Id.*

### 1.  Vera Thompson's Prior Criminal Record

The petitioner alleges appellate counsel was ineffective in failing to enter Vera Thompson's prior criminal record into evidence at the hearing on the motion for new trial.  The petitioner maintains that as a result, appellate counsel failed to present sufficient proof to support his claim that trial counsel was ineffective in failing to adequately cross-examine Thompson at trial regarding her prior criminal record.  We disagree.

On direct appeal, the petitioner alleged trial counsel was ineffective in failing to impeach Thompson's credibility through the use of her criminal record. John Earl Scales, 1999 Tenn. Crim. App. LEXIS 168, at *15.  This court noted that the record failed to reflect the nature of Thompson's prior convictions. *Id.* at **15-16.  However, this court's opinion on direct appeal sets out the "great efforts" employed by trial counsel to impeach Thompson on grounds other than her prior record. *See id.* at **16-17.  This court held the petitioner failed to establish prejudice in that the petitioner had not shown "how further impeachment by introducing evidence of Thompson's prior convictions–whatever the nature of those convictions might be–would cause the jury to reject Thompson's testimony." *Id.* at *17.  In the present appeal, the petitioner has not shown that he would have been granted relief had appellate counsel entered Thompson's prior record into evidence at the hearing.  Thus, the petitioner has failed to establish prejudice.

### 2.  Hearsay

The petitioner contends appellate counsel erred in neglecting to raise trial counsel's failure to object to hearsay statements at trial as grounds for ineffective assistance of trial counsel. According to the petitioner, one hearsay statement "names him as the shooter and purports to exclude

the name of Ms. Vera Thompson's son, 'Michael' Thompson," and a second statement indicates the petitioner's sister, Nicole, "'was telling people that she knew who shot Chester Martin.'"

The only evidence presented at the post-conviction relief hearing regarding this issue was appellate counsel's testimony that the two statements appeared to be hearsay and that he did not raise trial counsel's failure to object at trial as grounds for ineffective assistance of trial counsel. The post-conviction court found the petitioner did not establish prejudice. Based upon other evidence identifying the petitioner as the shooter, we agree the petitioner has not shown that he would have received relief had appellate counsel raised this issue. Thus, the petitioner has failed to establish prejudice.

### 3. Claims of Innocence

The petitioner contends appellate counsel was ineffective in failing to investigate and present evidence supporting his "claims of factual innocence" and in failing to challenge sufficiency of the evidence on direct appeal. The petitioner submits both trial counsel and appellate counsel failed to interview Michael Thompson, Vera Thompson's son, and failed to investigate information in Vera Thompson's initial statement to the police in which she identified "Michael" as the person who attempted to rob her. We disagree with these assertions.

As previously noted, any allegations regarding the effectiveness of trial counsel have been previously determined. Furthermore, appellate counsel was not ineffective in failing to challenge trial counsel's investigative efforts. The post-conviction court adopted the trial court's findings at the hearing on the motion for new trial that trial counsel spent more than one hundred hours preparing for the case. Moreover, Michael Thompson was deceased at the time of the post-conviction relief hearing, and the petitioner did not present any evidence indicating what Thompson would have stated had he been interviewed by either trial counsel or appellate counsel. As a result, the petitioner has also failed to establish that appellate counsel was deficient.

We further conclude appellate counsel was not ineffective in failing to challenge the sufficiency of the evidence on direct appeal. Where sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003).

As noted in this court's opinion on direct appeal, the state's theory of the case was that the petitioner attempted to rob Alvin Bevels and shot Chester Martin because "he was 'strung out' on crack cocaine and needed money to support his habit." John Earl Scales, 1999 Tenn. Crim. App. LEXIS 168, at *4. Both Vera Thompson and Bevels testified the petitioner and another man approached them, that the petitioner pointed a gun at Bevels and demanded money, and that the petitioner retreated once Thompson recognized him. Thompson, Bevels, and Hornbeck testified the

petitioner and his companion subsequently accosted Martin and the petitioner shot Martin. We conclude this evidence was more than sufficient to support the petitioner's convictions. Therefore, the petitioner has not established that appellate counsel's failure to raise sufficiency of the evidence on direct appeal resulted in prejudice.

Accordingly, we affirm the judgment of the post-conviction court.

_____
JOE G. RILEY, JUDGE